## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **CLEMENTINE M. CHARLES** | * | **CIVIL ACTION NO. 06-0296** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Clementine Charles, born January 25, 1954, filed applications for disability insurance benefits and supplemental security income on November 6, 2002, alleging disability as of August 21, 2002, due to heart problems, a pacemaker and lupus.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence,

based on the following:

**(1) Records from Lafayette General Medical Center dated September 4 to October 23, 2002**. On September 4, 2002, claimant was admitted with syncope. (Tr. 175-79). Dr. Jon D. Leleux implanted a dual chamber pacemaker. (Tr. 178-79). The diagnoses were symptomatic high grade AV block, mildly depressed ventricular function, and hypertension. (Tr. 178).

Claimant was readmitted on September 7, 2002, with complaints of significant chest pain. (Tr. 171). Dr. Leleux opined that she had some degree of low grade post pacemaker pericarditis. (Tr. 173). She was started on Indocin.

**(2) Records from University Medical Center ("UMC") dated August 21, 2002 to September 23, 2004**. On August 21, 2002, claimant presented with syncope. (Tr. 249-56, 280). Cardiology consult was done for evaluation of symptomatic bradycardia and syncope with left bundle branch block. (Tr. 250, 268). The impression was bradycardia. (Tr. 262).

Subsequently, claimant complained of chest pain and shortness of breath on several occasions. (Tr. 189-95, 232, 239-41, 416, 436-437, 456-57 ). X-rays taken on March 23, 2003, showed mild cardiomegaly. (Tr. 454). On May 9, 2003, x-rays showed that the heart was enlarged with a left ventricular configuration. (Tr. 444).

In 2003-2004, claimant was seen on several occasions for lupus and hypertension, which were well-controlled. (Tr. 369, 376, 402, 406, 410, 415-16, 424).

On September 22, 2004, claimant was seen for chest pain with occasional radiation to the left shoulder and back. (Tr. 360). The impression was chest pain, heart failure, hypertension, and SLE (systemic lupus erythematosus). (Tr. 363-64). She was continued on medications. (Tr. 363-64).

**(3) Consultative Examination by Dr. Nathaniel Winstead dated July 12, 2003**. Claimant presented for disability because of a pacemaker and lupus. (Tr. 283). She continued to have recurrent chest pain, and was referred for a work up for lupus as a cause of the pain. She described having a rash over her trunk and on the left side of her nose, which her primary care doctor thought was compatible with lupus. She also complained of weekly headaches lasting 20 minutes at a time. (Tr. 284). Her medications included Norvasc, HCTZ, Trandolapril, and Hydroxychloroquine. (Tr. 283).

Claimant was able to dress and feed herself; stand for about five minutes at a time, or about forty minutes in an eight hour day; walk about one block on level ground; sit for about two hours at a time, and lift about four pounds. She said that she could not drive. She was able to do simple household chores, such as sweeping,

3

mopping, vacuuming, occasional cooking, and doing the dishes.  She could also grocery shop, but could not climb stairs or mow the grass.

On examination, claimant was 65 inches tall and weighed 200 pounds.  (Tr. 284).  Her blood pressure was 142/101.  She ambulated well, and was able to get on and off the exam table and up and out of the chair without difficulty.  She had some splotches on her face at about nostril level, which Dr. Winstead felt was borderline as malar.

Claimant's visual acuity was 20/25 bilaterally without glasses.  Her heart had regular rate and rhythm.  (Tr. 285).  She had frequent premature ventricular contractions.

On spine/extremity examination, claimant's pulses were 2+ bilaterally.  She had no cyanosis, clubbing, or edema.  Her grip strength was 5/5.  She was able to ambulate without the need for an assistive device.  She had no atrophy or deformity of any muscle groups.

Claimant's sensory exam was intact.  She had no signs of any cerebellar deficits.  Her cranial nerves were intact.

Chest x-rays were fairly normal, with the exception of the pacemaker and large cardiac silhouette.  An EKG showed no evidence of any acute process; however, pacer spikes confounded interpretation.  Her medical records showed an ANA of

4

1:320 in clinic.

Dr. Winstead's impression was that claimant had a bad outcome from a cardiac event; however, she now had a pacemaker.  (Tr. 286).  He noted that she appeared to be relatively asymptomatic as to chest pain and shortness of breath.

As to claimant's lupus, Dr. Winstead said that claimant could go either way as to whether her rash was malar.  He was not sure if her ANA was in a pattern compatible with lupus.  He noted that she also had chest pain, which would be required for the diagnosis. He questioned this diagnosis.  However, he noted that she was currently on treatment and seemed to be improving symptomatically.

Dr. Winstead opined that even if claimant had lupus, he did not see it posing major functional limitations for her.  He did not think that she had any limitations on her ability to sit, stand, walk, lift, hear, speak, or handle objects.  He thought that she should take caution as to working in hazardous situations because of her pacemaker and occasional cardiac problems.

**(4) Residual Functional Capacity ("RFC") Assessment dated July 25, 2003**. The medical consultant determined that claimant could lift 20 pounds occasionally and 10 pounds frequently.  (Tr. 291).  She could stand, walk, and sit about 6 hours in an 8-hour workday.  She had unlimited push/pull ability.  She could occasionally climb ropes and stairs, crouch, and crawl; frequently balance, stoop, and kneel, and

never climb ladders, ropes, or scaffolds.  (Tr. 292).  She was to avoid concentrated exposure to hazardous conditions, such as machinery and heights, due to syncope. (Tr. 294).

**(5) Records from Dr. Jon Leleux dated August 21, 2002 to June 16, 2004**.
A Holter Monitor Report dated August 27, 2002 was abnormal, consistent with high-grade AV block.  (Tr. 339).  Catheterization revealed no occlusive coronary disease. (Tr. 325).  Her ejection fraction was mildly diminished at 45%, and she appeared to have concentric left ventricular hypertrophy.  Claimant's post-op clinical condition on September 30, 2002, was stable.  (Tr. 338).

In November and December, 2002, claimant continued to complain of fatigue and occasional chest discomfort.  (Tr. 306, 335-37).  An ANA test dated December 10, 2002, showed significant titer positive immunofluorescent antinuclear antibody in staining pattern suggestive of lupus or other autoimmune/collagen-vascular disease.  (Tr. 304).

On April 16, 2003, Dr. Leleux reported that claimant had a history of non-ischemic cardiomyopathy and hypertension, as well as moderate mitral regurgitation and a permanent pacemaker.  (Tr. 302).  He noted that she was doing much better, and had had no episodes of syncope after implantation of the pacemaker.  At that time, she had improved functional status.

On April 24, 2003, Dr. Leleux opined that claimant was able to perform any job duty.  (Tr. 301).

On June 16, 2004, Dr. Leleux stated that claimant had a history of congestive heart failure, a dual chamber pacemaker, mitral regurgitation, and lupus.  (Tr. 298). He noted that she had recently attempted to go back to work, but was unable to perform the tasks assigned to her.  He observed that she became dyspneic and had chest discomfort with minimal exertion.

**(6) Consultative Internal Medicine Examination by Dr. Christiane Eisele dated October 2, 2004**.  Claimant complained of lupus with chronic fatigue, difficulty lifting greater than 20 pounds, and flare ups twice a week; a pacemaker, for which she had no complaints; mitral regurgitation, and hypertension.  (Tr. 524).  She reported having chest pain lasting approximately three days at a time.   Her medications included Coreg, Mavik, Spironolactone, Hydroxychloroquine, and Lasix. (Tr. 525).

Claimant could dress and feed herself; stand for 15-20 minutes at a time, for a total of 45 minutes in 8 hours; walk for one quarter mile; sit for 30 minutes, and lift 10 pounds.  (Tr. 524).  She did not drive.  She stated that she could shop, cook, and do dishes.

On examination, claimant was 65 inches tall and weighed 206 pounds.  (Tr. 525).  Her blood pressure was 129/92.  She was able to get on and off the exam table, up and out of the chair, and dress and undress without difficulty.  She had no rash, discolorations, or major scars.

On cardiac exam, claimant had regular rate and rhythm with a pulse of 72.  She had a 2/6 early systolic murmur.

On spine/extremities exam, claimant had no tenderness, deformity, or step offs.  Her pulses were 2+.  She had no clubbing, cyanosis, or edema.

Claimant had no swelling, redness, or effusion in any joints.  (Tr. 526).  She had normal gait with no assistive device required.  Her grip strength was 5/5 bilaterally.  She had no range of motion problems.  She was able to walks on her heels and toes, squat, and walk heel to toe.

Neurologically, claimant's mentation was normal.  Her motor strength was 5/5 in all groups.  Her sensory examination was entirely normal.  Her cranial nerves were intact, and deep tendon reflexes were 2+ throughout.

Dr. Eisele's impression was that claimant had no issues at that time with her cardiac problems and pacemaker.  She had had no problems with the pacemaker, and this problem appeared to be entirely resolved.

As to claimant's lupus, Dr. Eisele noted that while claimant appeared to have some flare ups at times, she still did not have a confirmed diagnosis.  (Tr. 527).  On examination, claimant had no specific findings, and did not appear to have any significant difficulties.  Dr. Eisele noted that because of claimant's lupus flare ups, she required more flexibility with her activities, as when she was in remission her status was entirely normal, but during a flare up, she might very well have significant difficulties.

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Eisele opined that claimant was able to lift/carry 25 pounds occasionally, except when she had a lupus flare up.  (Tr. 528).  Her ability to stand, walk, and sit was not affected by her impairment.  (Tr. 528-29).  Her push/pull ability was limited during a flare up due to upper extremity fatigue.  (Tr. 529).  She had no postural limitations.

**(7) Records from Medical Center of Louisiana in New Orleans dated April 22 to May 31, 2005**.  Claimant was admitted for replacement of failing leads and placement of a difibrillator.  (Tr. 542-49, 837-985).  A transthoracic echocardiogram revealed very poor left ventricular function, severe mitral regurgitation secondary to ventriculo-annulus dilatation, and pulmonary hypertension.   (Tr. 547).   Her postoperative diagnoses were nonischemic cardiomyopathy; severe impairment of

ventricular function, positive tissue doppler, and biventricular CRT therapy.  (Tr. 542, 889).

**(8) Records from Dr. Glenn A. LaFleur dated February 4, 2005**.  Dr. LaFleur reported that he had been treating claimant for two and a half years for congestive heart failure, cardiac valvular disease (mitral regurgitation), third-degree heart block, systemic lupus erythematosus, and hypertension.  (Tr. 554).  Her recent laboratory tests revealed + ANA titer 1:1280, + Anti-SSB ›151, and + RNP ›23.  She continued to receive treatment for cardiology and rheumatology.

Dr. LaFleur noted that secondary to claimant's condition, she had been unable to perform her duties as a hotel housekeeper for the past year.  He stated that any attempts to perform such duties immediately resulted in dyspnea and worsening, debilitating multi-joint pain.  He wrote that claimant also had difficulties ambulating for distances greater than 150 feet, which resulted in severe dyspnea and chest discomfort.  He observed that she was able to complete activities of daily living, but that they had to be performed at her own pace with frequent rest periods.  He further noted that her previous employment required that she complete duties within certain time restraints.

Dr. LaFleur opined that, secondary to claimant's chronic ailments, she could not adequately perform the duties of her former employment.  He thought that she

10

should refrain from any future employment requiring physical exertion, which would further exacerbate her symptoms.

**(9) Claimant's Administrative Hearing Testimony**.   At the hearing on September 13, 2004, claimant was 50 years old.  (Tr. 32).  She testified that she was 5 feet 5 inches tall and weighed 210 pounds.  She stated that she had completed the ninth grade.  (Tr. 33).

Claimant testified that she had worked as a hotel housekeeper and a kitchen helper.  (Tr. 34-35).  She stated that she had stopped working in August, 2002 when she was diagnosed with heart disease.  (Tr. 34).  She reported that she had passed out while cleaning a room.  (Tr. 39).

Regarding complaints, claimant testified that she had hypertension, lupus, and heart disease.  (Tr. 39).  She stated that she had had a pacemaker implanted in August of 2002.  (Tr. 40).  She reported that she took medication for hypertension, lupus, and congestive heart failure.  (Tr. 40, 48).  She said that the medication controlled her hypertension.  (Tr. 40).  She complained that lupus made her tired, and caused chest pain, leg weakness, headaches, blurred vision, and dizziness on exertion.  (Tr. 40-41, 56).

As to activities, claimant testified that she cooked, folded clothes, emptied the garbage,  picked up the mail, and washed dishes.  (Tr. 42-44).  She stated that her

11

daughter or a friend helped her with shopping.  (Tr. 43).  She reported that she visited with friends and relatives who lived down the street.  (Tr. 44).

Additionally, claimant went to church every Sunday and attended functions there.  (Tr. 44-46).  She also watched television and read the newspaper.  (Tr. 45).

Regarding restrictions, claimant testified that she could lift five pounds.  (Tr. 50).  She stated that she could stand for about 45 minutes with two breaks.  (Tr. 46). She complained that she occasionally had problems sleeping.  (Tr. 46-47).

In addition, claimant testified that she could walk for 5 blocks, which took about 45 minutes.  (Tr. 49).  She stated that she could stand for about 15 minutes. (Tr. 50).  She said that she could sit for a long time.

Claimant also reported that she could not climb stairs.  She said that she could reach forward and overhead, and grip with both hands.  (Tr. 50-51).  She stated that she could squat and kneel for short periods.  She testified that she could concentrate, follow simple instructions, and deal with supervisors, coworkers, and the public.  (Tr. 51).  However, she said that crowds bothered her because she could not breathe.  (Tr. 52).

**(10) Administrative Hearing Testimony of Nancy Broussard**. Ms. Broussard testified that she was claimant's supervisor at the hotel at the time that claimant passed out at work.  (Tr. 58).  She stated that claimant had attempted to return to

work, but that she could not clean a room in 26 minutes as required.  Accordingly, claimant was terminated.

**(11) Administrative Hearing Testimony of Claimant's Daughter, Tenique Nedd**.  Ms. Nedd testified that after her mother got a pacemaker, she noticed a dramatic change in claimant's daily activities.  (Tr. 60).  She stated that she and her husband had moved in with claimant to help her.  (Tr. 61).  She reported that claimant had to rest between chores.  (Tr. 62).  She said that her mother would unable to finish a job.  (Tr. 62).

**(12) Administrative Hearing Testimony of Dr. George E. Hearn, Vocational Expert ("VE")**.  Dr. Hearn classified claimant's past work as a housekeeper as light and unskilled, and a kitchen helper as medium and unskilled. (Tr. 65).  The ALJ posed a hypothetical question in which he asked Dr. Hearn to assume a claimant of the same age, education, and work experience; who was capable of performing work that required lifting and carrying 20 pounds occasionally and 10 pounds frequently; could stand, walk, or sit for six hours, and had push/pull ability limited only by the ability to lift and carry.  (Tr. 66).  In response, the VE testified that claimant would be able to perform her past work.  When the ALJ added a sit-stand option and the ability to take breaks as needed, Dr. Hearn stated that claimant would not be able to perform her past work or any other work.  (Tr. 66-67).

13

**(13) The ALJ's Findings**.  Claimant argues that the ALJ failed to properly evaluate all of her medically-determined impairments, in combination, resulting in a residual functional capacity that was unsupported by the totality of the evidence and an erroneous finding that claimant could perform her past relevant work at Step 4. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I recommend that the Commissioner's decision be **REVERSED,** and that the claimant be awarded benefits.

Claimant specifically argues that while the ALJ found that she suffered from hypertensive cardiovascular disease and a pacemaker for third degree block (Tr. 18), she failed to consider these conditions in combination with her other impairments of congestive heart failure, systemic lupus erythematosus, and obesity.  (rec. doc. 7, pp. 3-4).

The ALJ cites reports from the consultative examiners, Drs. Winstead and Eisele, suggesting that claimant did not have a definitive diagnosis of lupus.  (Tr. 19-20).  However, the records from claimant's treating physicians at UMC, Medical Center of Louisiana in New Orleans, and Dr. Leleux reflect that claimant had been diagnosed with and treated for lupus for many years.  (Tr. 298, 363-64, 369, 376, 402, 406, 410, 415-16, 424, 554).  While the ALJ cited Dr. Leleux's opinion from April, 2003, indicating that claimant was able to perform any job duty (Tr. 301), she failed

14

to adequately consider his next report dated June 16, 2004.  (Tr. 22).  This report, which the ALJ cited earlier in the decision (Tr. 20), indicated that claimant had recently attempted to go back to work, but was unable to perform the tasks assigned to her because of dyspnea and chest discomfort with minimal exertion.  (Tr. 298). Dr. Eisele confirmed that during a lupus flare up, claimant "may very well have significant difficulties."  (Tr. 527).

A subsequent report by Dr. LaFleur indicated that secondary to claimant's condition, she had been unable to perform her duties as a hotel housekeeper for the past year.[1]  (Tr. 554).  He stated that any attempts to perform such duties immediately resulted in dyspnea and worsening, debilitating multi-joint pain.  He further indicated that claimant had difficulties ambulating for distances greater than 150 feet, which resulted in severe dyspnea and chest discomfort.  He observed that she was able to complete activities of daily living, but that they had to be performed at her own pace with frequent rest periods.  He also noted that her previous employment required that she complete duties within certain time restraints.

Dr. LaFleur concluded that, secondary to claimant's chronic ailments, she could not adequately perform the duties of her former employment.  He thought that

---

[1]This report was dated two months after the ALJ's decision but was presented to the Appeals Council.

she should refrain from future employment requiring physical exertion, which would further exacerbate her symptoms.

Claimant argues that the ALJ's failure to give proper consideration to all of her impairments resulted in a residual functional capacity assessment that was unsupported by the totality of the evidence.  (rec. doc. 7, p. 5).  The ALJ found that claimant retained the RFC to perform occasional lifting and/or carry of up to 20 pounds, frequent lifting and/or carrying of up to 10 pounds, standing and/or walking for up to 6 hours in an 8-hour workday, and sitting for up to 6 hours in an 8-hour workday.  (Tr. 23).  Based on this RFC, the ALJ determined that claimant could return to her past work as a hotel housekeeper, work she had done since 1969.  (Tr.35).

However, the ALJ failed to consider Dr. Eisele's opinion that claimant's abilities would be limited during lupus flare ups.  (Tr. 528-29).  Additionally, she did not consider Dr. LeLeux's report indicating that claimant had attempted to return to work as a housekeeper, but was unable to perform the tasks assigned to her.  (Tr. 298).  Claimant's former supervisor, Nancy Broussard, confirmed that claimant had attempted to return to work, but could not clean a room in 26 minutes as required.  (Tr. 58).

Because of claimant's lupus flare ups and heart problems, she argues that she does not have the ability to sustain employment, citing *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002) and *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). (rec. doc. 7, p. 8). *Frank* explained how the court must analyze a claimant's ability to maintain employment under *Watson*, stating as follows:

> *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if [plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. **At bottom, Watson holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time**. An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added). *Id*. at 619.

In this case, Dr. Eisele confirmed that because of claimant's lupus flare ups, she required more flexibility with her activities, because she might very well have significant difficulties during those times. (Tr. 527). The reports from Drs. LeLeux

17

and LaFleur also indicate that claimant would have difficulty maintaining employment due to her cardiac problems and lupus.  (Tr. 298, 554).  The vocational expert, Dr. Hearn, confirmed that a claimant who would need a sit-stand option and the ability to take breaks as needed would not be able to perform her past relevant work as a housekeeper.  (Tr. 66). Factually, this was confirmed by claimant's supervisor, Broussard, who said that claimant was terminated when she attempted to return to work as a housekeeper, when she was unable to clean rooms within the twenty-six minutes allowed for that work. Broussard's credibility was not challenged by the ALJ. The ALJ characterized this termination as "due to inadequate performance". (Tr. 21).

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time.  *Watson v. Barnhart*, 288 F.3d 212, 217 (5ᵗʰ Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).  According to the medical records, claimant would be unable to maintain gainful employment due to her impairments. Thus, the ALJ erred in her determination that claimant retains the capacity for work.

Because I find that the ALJ erred in determining that claimant was capable of retaining the capacity for work, the undersigned recommends that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits. The undersigned recommends that August 21, 2002, which is the onset date, be used as the date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

19

**EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed at Lafayette, Louisiana, February 16, 2007.

C. Michael Hill
_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE